Scott S. Durand *et al.* Appellants, *vs.* Oliver E. Dyson
*et al.* Appellees.

*Opinion filed December 22, 1915—Rehearing denied Feb. 3, 1916.*

1. Constitutional law—*fourteenth amendment of the Federal constitution does not interfere with police power of the State.* The fourteenth amendment of the Federal constitution was not designed to interfere with the exercise of the police power of the State, and it is only where the State arbitrarily and unnecessarily interferes with private business or imposes unusual and unnecessary restrictions upon lawful occupations that legislation will be declared to be in contravention of·such amendment.

2. Same—*what necessary to authorize exercise of police power by the State to abate nuisance.* To justify a State in exercising its police power for the destruction or abatement of what may be determined to be a public nuisance, it must appear that the interest of the public generally, as distinguished from a particular class, requires the interference of the State, and that the means employed are reasonably necessary for the accomplishment of the purpose and not unduly oppressive upon individuals.

3. Same—*sections 2 and 8 of the act to prevent spread of contagious diseases among animals are valid.* Sections 2 and 8 of the act for the suppression and prevention of the spread of contagious and infectious diseases among domestic animals, as amended in 1915, (Laws of 1915, p. 3,) which authorize the killing of infected cattle by the order of the Board of Live Stock Commissioners and fix the method of compensating the owner, are not in violation of the State or Federal constitution.

4. Nuisances—*when party has no constitutional right to hearing before property is destroyed.* Cattle afflicted with a dangerous and contagious disease are a public nuisance the abatement of which often requires prompt and summary proceedings, and the owner of such cattle has no constitutional right to a hearing before the cattle are destroyed in pursuance of a statute authorizing the matter to be investigated and dealt with in a summary manner by a board created for that purpose.

5. Same—*when court of equity will not interfere to prevent destruction of property.* Where the State, in the valid exercise of its police power, has provided for the destruction of property which is a public nuisance dangerous to the health and welfare of the public, a court of equity will not interfere to restrain public officers from performing the duties enjoined upon them, but the remedy, if any, of the owner of the property is at law.

6. SAME—*whether a disease is contagious and dangerous is a legislative question.* Whether a certain disease with which cattle are afflicted is a dangerous and contagious disease and whether particular cattle are afflicted with such disease are questions to be determined by the legislature in the manner provided by it, and if the statute itself is valid a court of equity will not assume to decide such questions, but will leave their determination to the authorities in whom that power has been vested by the legislature.

APPEAL from the Circuit Court of Lake county; the Hon. CHARLES H. DONNELLY, Judge, presiding.

ROBERT S. ILES, and CHARLES J. O'CONNOR, for appellants.

P. J. LUCEY, Attorney General, and LESTER H. STRAWN, for appellees.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Appellants, Scott S. Durand and Grace G. Durand, filed in the circuit court of Lake county a bill for an injunction to restrain Oliver E. Dyson, R. W. Patterson, B. J. Shanley and L. F. Brown, and their agents, employees and assistants, from slaughtering their herd of cattle. A temporary injunction having been awarded by the master in chancery without notice, appellees appeared in court and by agreement of the parties the record showed a motion, in substance, to dissolve the temporary injunction and to dismiss the bill for want of equity. The court, on consideration of the motion, dissolved the temporary injunction and dismissed the suit for want of equity. On motion of appellants, supported by affidavit, the court further ordered that the temporary injunction be continued in full force pending the determination of the appeal to the Supreme Court then and there prayed by appellants.

The averments in the bill are, substantially, that appellees R. W. Patterson, B. J. Shanley and L. F. Brown, individually and collectively as members of the Board of Live

Stock Commissioners of the State of Illinois, and Oliver E. Dyson, individually and as State veterinarian of Illinois, and various agents, employees and assistants of appellees, threaten and are about to kill sixty-one head of pure-bred and registered Guernsey cattle belonging to the appellants and located on their farm in the township of Shields, in said county, which are of the value of not less than $35,000; that appellees, their agents and assistants, have no legal right or interest in said animals; that appellees represent the State of Illinois under and by virtue of an act of the legislature entitled "An act to revise the law in relation to the suppression and prevention of the spread of contagious and infectious diseases among domestic animals," which they claim authorizes them to kill animals afflicted with or exposed to a dangerously contagious or infectious malady, and also insist that appellants' said cattle are afflicted with such a malady, (known as the hoof and mouth disease,) and that said statute authorizes them to kill all of said herd, and requires appellants to consent thereto and to accept therefor the sum of $13,500, the valuation at which they have been appraised, and upon failure of appellants to so consent, that then appellees are authorized by the statute to take and kill said animals without any compensation whatever to appellants; that a large number of appellants' animals are entirely well of the disease of which it is claimed by appellees that they are afflicted and that the animals so recovered are immune; that the remainder of them not entirely cured are through the crisis and convalescing from the disease; that the animals cured are neither carriers of the disease nor liable to a recurrence of an attack therefrom; that said animals and the premises whereon they are situated can be fumigated, disinfected and as thoroughly cleansed as they could be after the death and burial of the animals, and that none of said animals are now afflicted with any malady that is dangerously contagious or infectious; that appellees are now digging trenches on appel-

lants' farm preparatory to burying said animals, and will kill them on finishing the same unless restrained; that if notice of the application for the injunction is given, appellees will kill the animals before the court will have an opportunity to pass upon the application; that by granting the injunction without notice and without bond no harm can come to anyone, as all the animals are kept in close quarantine. The bill further avers that said law is unconstitutional as construed and applied by appellees, in that it is an unreasonable exercise of the police power of the State and takes private property without due process of law, contrary to the express provisions of the constitution of the United States and of the constitution of this State, and because it violates other provisions of said constitution.

Motions were made in this court to set aside the order of the circuit court providing that the temporary injunction be continued pending this appeal, and that the cause be decided on its merits by this court before the adjournment of this term. Owing to the great importance of the case to the parties and to the public generally, the motions were taken and considered together and the order and decree of this court were entered in term time, with the announcement that the opinion of the court in the case would be filed later.

The material provisions of the statute referred to in appellants' bill, in so far as they are pertinent to the questions raised on this appeal, are found in the amendments to sections 2 and 8 thereof, approved June 29, 1915, in force July 1, 1915. (Laws of 1915, p. 3.) Section 2 thereof provides: "It shall be the duty of said Board of Live Stock Commissioners to cause to be investigated any and all cases, or alleged cases, coming to their knowledge, of communicable diseases among domestic animals, within this State, and to use all proper means to prevent the spread of such diseases, and to provide for the extirpation thereof; and in the event of reasonable grounds for the belief that any such

271 — 25

communicable disease exists in this State, it shall be the duty of the person owning or having in charge any animal or animals infected with such disease, * * * to immediately notify said Board of Live Stock Commissioners, or some member thereof, * * * of the existence of · such disease, and thereupon it shall be the duty of said board, or some member thereof, * ·* * immediately to cause proper examination thereof to be made, and if such disease shall be found to be a dangerously contagious or dangerously infectious malady, said board, or any member thereof, or the State veterinarian, or any assistant State veterinarian, shall order such diseased animals, and such as have been exposed to contagion, and the premises in or on which they are, or which may have been recently occupied by them, to be strictly quarantined; * * * which quarantine, and every quarantine establishd· under the provisions of this act, shall remain in force and effect until removed by order of said board; and said board shall prescribe such regulations as they may deem necessary to prevent any such disease from being communicated from any such diseased animal or exposed animal or from the infected premises or through any other means of communication. In all such cases the said Board of Live Stock Commissioners, or in case the number of animals shall not exceed five, any member thereof, shall have power to order the slaughter of any or all of such diseased or exposed animals. The said board shall also have power to cause to be destroyed all barns, stables, premises, fixtures, furniture and personal property infected with any such communicable disease so far as in their judgment may be necessary to prevent the spread of such disease and where the same cannot be properly disinfected. * * *

"When the said board * * * determines that any animal is affected with, or has been exposed to, any dangerously contagious or infectious disease, the board or any member thereof, * * * may agree with the owner upon

the value of such animal or of any property that it may be found necessary to destroy, and in case such an agreement cannot be made, said animals or property shall be appraised by three competent and disinterested appraisers.  *  *  *

"Upon such appraisement being made, it shall become the duty of the owner to immediately destroy such animals and to dispose of the carcasses thereof, and to disinfect the premises occupied by such animals, in accordance with the rules prescribed by said board governing such destruction and disinfection. And upon his failure so to do, said board * * * shall cause such animal or animals or property to be destroyed and disposed of, and thereupon such owner shall forfeit all right to receive any compensation for the destruction of such animal or animals or property."

"Sec. 8. All claims against the State arising from the slaughter of animals as herein provided for, shall be made to the Board of Live Stock Commissioners, * * * and it shall be the duty of said board to determine the amount which shall be paid in each case on account of the animals so slaughtered and fix the fair cash value thereof in health if of the bovine species, for beef, dairy and breeding purposes, in no event to exceed three hundred dollars ($300) for any registered animal and not to exceed one hundred fifty dollars ($150) for any animal not registered; nor to exceed an average value of two hundred fifty dollars ($250) per head for all registered animals in any herd and not to exceed an average value of one hundred and twenty-five dollars ($125) per head for all non-registered animals in any herd, * * * and said board shall certify the same to the Governor for his approval, and if the Governor shall find that said appraisers have proceeded in accordance with law, he shall approve the same for payment, and the Auditor of Public Accounts shall, upon presentation of the same to him, thereupon issue his warrant upon the State Treasurer for the amount fixed by said appraisers in favor of the owner of the animals."

If the decree of the court in this case denies to appellants any rights and privileges guaranteed to them under the constitution of the United States or under the constitution of this State, it must necessarily follow that the said statute is not a legitimate exercise of the police power of the State for the suppression and prevention of dangerously contagious and infectious diseases among domestic animals. It is the settled doctrine of the Supreme Court of the United States that the fourteenth amendment of the constitution was not designed to interfere with the exercise of the police power of the State. (*Powell* v. *Pennsylvania,* 127 U. S. 678.) This court has also declared that "in the exercise of the police power the command, 'so use your own property as not to injure others,' and the maxim, 'the safety of the people is the supreme law,' are to be observed and given effect." *Sings* v. *City of Joliet,* 237 Ill. 300.

In speaking of the extent and limits of what is known as the police power, the Supreme Court of the United States said in *Lawton* v. *Steele,* 152 U. S. 133: "It is universally conceded to include everything essential to the public safety, health and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. Under this power it has been held that the State may order the destruction of a house falling to decay or otherwise endangering the lives of passers by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; the destruction of decayed or unwholesome food; the prohibition of wooden buildings in cities; * * * the restriction of objectionable trades to certain localities; the compulsory vaccination of children; the confinement of the insane or those afflicted with contagious diseases; * * * the prohibition of gambling houses and places where intoxicating liquors are sold. Beyond this, however, the State may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the

legislature to determine not only what the interests of the public require but what measures are necessary for the protection of such interests." The court then lays down the further rule that to justify the State in thus interposing its authority it must appear, first, that the public generally, as distinguished from those of a particular class, require such interference; and second, that the means are reasonably necessary for the accomplishment of the purpose and not unduly oppressive upon individuals. While it is true that such legislation is subject to the supervision of the courts, it is only in such cases where the State arbitrarily and unnecessarily interferes with private business or imposes unusual and unnecessary restrictions upon lawful occupations that such legislation will be declared as in contravention of the fourteenth amendment.

Cattle afflicted with a dangerous and contagious disease are public nuisances as defined by the common law, and under the common law such a nuisance could not be legalized because it invaded the peace and safety of the people. (*Ferguson* v. *City of Selma,* 43 Ala. 399.) Prevention of the spreading of dangerous diseases among cattle is now universally recognized in this country as within the domain of the police power, as it is so essential to the public safety and health. It is also now generally recognized that where the disease among cattle is so very dangerous and of so contagious or infectious a character as to be communicable to human beings through the consumption of the flesh or milk of such animals as have the disease, as the foot and mouth disease is generally considered to be, legislatures may, and should, confer upon boards or commissions the power to destroy animals afflicted with such a disease when thought to be necessary to public safety. (*New Orleans* v. *Charouleau,* 121 La. 890; 18 L. R. A. (N. S.) 368; *Shipman* v. *Live Stock Commission,* 115 Mich. 488; *Houston* v. *State,* 98 Wis. 481; 42 L. R. A. 39; *Miller* v. *Horton,* 152 Mass. 540; 10 L. R. A. 116, which is a case upholding

a statute authorizing summary proceedings to kill horses with the glanders.) There are numerous other cases that recognize the power of a State to order the destruction of valuable property without compensation to the owner when it has become a public nuisance. *Adams* v. *Milwaukee,* 144 Wis. 371; 228 U. S. 572; *Lawton* v. *Steele, supra; North American Cold Storage Co.* v. *City of Chicago,* 211 U. S. 306; *Sings* v. *City of Joliet, supra.*

Proceedings for the destruction of property in many cases must necessarily be summary and without a previous trial or hearing. It would certainly not be contended by anyone that a hearing ought to be had before demolishing a building in the path of a conflagration that was rapidly destroying a city, in case of the isolation and confinement of a person afflicted with small-pox or with the bubonic plague, or before the destruction of a dog suffering with rabies. In some cases hearings may be reasonably had before the destruction of property, but when the question is one regarding the destruction of animals or food which is not only unfit for human use but may be fatal to those who use it, the emergency is such that the legislature should have the entire disposition of the matter without being subject to being reviewed and their acts declared void by the courts. (*North American Cold Storage Co.* v. *City of Chicago, supra.*) We are therefore of the opinion that the act of the legislature in question is not in contravention of any constitutional provision.

A court of equity has no jurisdiction to declare void an act of the legislature that does not contravene either the constitution of this State or of the United States, and to restrain officers, by the writ of injunction, from performing their official duties under the law and to attach them for contempt in case they violate the injunction of the court. Such a decree or judgment would not only be judicial legislation, but would interfere with one of the

highest prerogatives of organized government,—the preservation of the public health and the public safety.

Appellants have alleged, with great particularity, a number of grounds upon which they rely for their claim that the decree of the court should be reversed. All of these grounds are based upon the claim that the statute in question is an unreasonable exercise of the police power and that it authorizes the destruction of valuable property without due process and without full compensation. We have considered all of these grounds carefully. We do not deem it necessary to discuss them in detail. Our conclusion that the legislature had the constitutional right and power to enact all the provisions of the statute necessarily disposes of all questions raised by appellants. It must be presumed by this court that the legislature has carefully investigated and has properly determined that the interests of the public require legislation that will insure the public safety and the public health against threatened danger from diseased animals. The determination of that fact is the province of the legislature and not of the courts. It is also the province of the legislature and not of the courts to determine what measures are necessary for the protection of such interests. This court is not able to say that the legislature in this act has abused its discretion and that the measures it has adopted to prevent the spread of dangerous diseases among cattle are unnecessary and unreasonable. The investigation and determination of the question whether or not animals are afflicted with dangerously contagious and infectious diseases demand prompt action if the spread of the diseases is to be prevented, as well as the question whether or not the slaughter of the animals is necessary. To secure this prompt investigation and determination it is necessary and customary to lodge these duties with a board or commission. (*King* v. *Davenport,* 98 Ill. 305; *North American Cold Storage Co.* v. *City of Chicago, supra.*) All the questions raised by appellants by the averments in their bill are

therefore questions of fact to be settled by the legislature and by the Board of Live Stock Commissioners and not by a court of equity, when it is determined by the court that the act is not in contravention of any constitutional provision. Whatever remedy appellants may have, if any, is at law, as is clearly apparent upon the face of the bill; and in our determination of this case we have treated the motions to dissolve the injunction and to dismiss the bill as a demurrer, which admits all facts in the bill well pleaded. *Smith* v. *Kochersperger,* 173 Ill. 201.

For the same reasons we hold that the court did not err in overruling appellants' motion to file their amended and supplemental bill, and in our consideration thereof have treated the motion as filed in apt time. That bill merely restates, in substance, the averments of the original bill and adds others of like character and others still that tend to weaken the force of the allegations rather than to strengthen them because of their inconsistency. Of this latter character of averments are the following: "That about August 16, 1915, a valuable bull of complainants became afflicted with a sore mouth; that a skillful veterinarian examined it and diagnosed said disease as not foot and mouth disease; that afterwards Dr. Lavery, an inspector for the bureau of animal industry of the United States, examined the said animal and said it was not afflicted with foot and mouth disease; that afterwards certain cows of complainants became affected in a slight degree with sore mouths similar to the bull; that an agent of the defendants came and examined said animals and said it was foot and mouth disease and the defendants then ordered all of complainants' cattle to be killed; * * * that the cattle of the complainants are so far recovered that no results now remain except certain extraneous infection of the feet of a few of said cattle, and that said infection is not of the nature of foot and mouth disease." It is also alleged in the bill that said foot and mouth disease is not a dangerously contagious

and infectious disease and is not communicable to human beings so as to render it dangerous to life and health. In still another part of the bill it is averred that three of appellants' cows died of the disease and that two of them so affected were killed by appellants. Many other evidentiary facts are alleged in the amended bill for the purpose of showing that the foot and mouth disease is not a dangerously contagious or infectious disease and that it is curable and that the public can be securely guarded against it by quarantine, and that many of appellants' cattle are cured and that the remainder are being cured. The amended bill discloses that experts are not agreed upon many of the questions therein raised, but for reasons aforesaid it was not the province of the court to settle and try the questions raised by the bill after settling the constitutional question against appellants, and the motion to file the amended bill was properly overruled.

The temporary injunction was therefore dissolved and the decree affirmed.

*Decree affirmed.*