(No. 16253.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in
Error, vs. EDWIN F. WITTE, Plaintiff in Error.

Opinion filed December 16, 1924—Rehearing denied Feb. 6, 1925.

1. POLICE POWER—police power includes any regulation for pro-
tection of life or health. The State, in the exercise of the police
power, has the right to regulate any and all occupations for the
protection of the lives and health of the people and may adopt any
measures and regulations for that purpose, provided they do not
infringe upon constitutional rights.

2. SAME—the legislature is sole judge of what laws should be
enacted to protect health. Within constitutional limits the Gen-
eral Assembly is the sole judge of the laws that shall be enacted
for the protection of the public health.

3. MEDICINE AND SURGERY—right to practice medicine is subject
to regulation. The right of a citizen to practice medicine is sub-
ject to the paramount power of the State to impose such regula-
tions, within the limitations of the constitution, as may be required
to protect the people against ignorance, incapacity, deception or
fraud in the practice of that profession, but the measures adopted
must be reasonably necessary and appropriate to the accomplish-
ment of legitimate objects within the domain of the police power.

4. SAME—Medical Practice act does not discriminate in favor
of general practitioners. The Medical Practice act, in prohibiting
those engaged in drugless and non-surgical healing from engaging
in the general practice of medicine but making no similar prohi-
bition of general practitioners from engaging in drugless healing,
makes no unjust discrimination in favor of those engaged in the
general practice, as anyone engaged in the latter practice must have
passed the examination prescribed by section 8 of the act, and re-
stricted practitioners are permitted by sections 12 and 12a to qual-
ify themselves to take such examination.

5. SAME—Medical Practice act does not discriminate in favor
of medical schools. The Medical Practice act, in not allowing a
graduate of a school teaching a form of drugless healing to prac-
tice surgery without taking a course in materia medica and other
subjects even though such school gives a course in surgery, does
not discriminate in favor of the regular medical schools, as sec-
tion 12 permits a drugless practitioner to obtain an unlimited license
by pursuing the additional courses of study in "any professional

school, college or institution teaching any system or method of treating human ailments."

6. SAME—*section 12 of Medical Practice act applies to all holders of restricted licenses.* Section 12 of the Medical Practice act, permitting practitioners of drugless healing to qualify to take the examination for a general or unrestricted license, applies to all holders of limited or restricted licenses, under whatever act issued, as section 22 provides that all licenses theretofore issued shall have the same force and effect as licenses issued under the act.

7. SAME—*dentists, pharmacists and optometrists are subject to Medical Practice act.* All persons are subject to the Medical Practice act, including dentists, pharmacists and optometrists, although they practice their professions under the particular statutes applicable to them, and they are exempt from the provisions of the Medical Practice act only to the extent that they are included within the dental, pharmacy and optometry acts.

8. SAME—*the Medical Practice act does not delegate legislative powers to Department of Registration and Education.* The Medical Practice act, in delegating to the Department of Registration and Education the making of rules and regulations under which all examinations under the act shall be conducted, does not delegate legislative power to such department, as the department is not permitted arbitrarily to prescribe minimum standards of educational requirements nor conduct examinations of applicants for licenses according to its arbitrary whim or caprice, but the act itself fixes such standards, and where rules and regulations are authorized they are subject to review by the courts to determine whether or not they are reasonable.

DUNCAN, C. J., and FARMER, J., dissenting.

WRIT OF ERROR to the Municipal Court of Chicago; the Hon. JOSEPH W. SCHULMAN, Judge, presiding.

DARROW, SISSMAN, HOLLY & CARLIN, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, CLARENCE N. BOORD, HENRY T. CHACE, JR., and EDWARD E. WILSON, (HARRY EUGENE KELLY, and B. L. CATRON, of counsel,) for the People.

Mr. JUSTICE DeYOUNG delivered the opinion of the court:

An amended information was filed in the municipal court of Chicago which charged that Edwin F. Witte on October 24, 1923, treated Anna Nemac for an ailment by a system or method known as naprapathy, without a license to do so. A motion to quash the amended information on the ground that the statute upon which it was based is unconstitutional was denied. A jury trial followed. From the prosecution's evidence it appeared that Anna Nemac was afflicted with rheumatism; that she called on Witte, who, after interrogating her concerning her ailment, gave her twelve treatments, which consisted solely of a manipulation of the spine, and for which she was charged $25. The defendant admitted that he had no license to treat human ailments. He offered to prove by Dr. H. M. Hess, president of the American Naprapathic Association, that there were about 450 persons in the United States who practiced naprapathy; that it is a drugless system of treating human ailments, discovered in 1905; that the theory underlying it is that many of the ailments of the human body are due to a tightened or shrunken condition of a ligament; that such condition is referred to as a ligatight, and where it takes place near a nerve it brings a mechanical tension on that nerve and induces an abnormal function, and that the conception of ligatights as a causative factor of human ailments is peculiar to the system of naprapathy and is one of its fundamental principles. The offer included a statement of the subjects taught in the College of Naprapathy and of the courses of study required for the graduation of its students. An objection to the offer was sustained. The jury found the defendant guilty and a judgment imposing a fine of $500 was entered. He prosecutes this writ of error on the ground that the constitutionality of the Medical Practice act is involved.

The State, in the exercise of the police power, has the right to regulate any and all occupations for the protection of the lives and health of the people. All measures and regulations for that purpose which do not infringe upon constitutional rights are within the scope of the police power. Within constitutional limits the General Assembly is the sole judge of the laws that shall be enacted for the protection of the public health, and so long as such laws do not invade inherent or constitutional rights the determination of the General Assembly is conclusive. The right of a citizen to practice medicine is subject to the paramount power of the State to impose such regulations, within the limitations of the constitution, as may be required to protect the people against ignorance, incapacity, deception or fraud in the practice of that profession. But the measures adopted must be reasonably necessary and appropriate for the accomplishment of legitimate objects within the domain of the police power. *People* v. *Kane, 288* Ill. *235.*

Careful preparation is required of one who enters the medical profession. No one has, or ought to have, the right to practice medicine who does not possess the necessary skill and learning. The physician must not only be able to detect readily the presence of a disease, but also to ascertain its nature or character and to prescribe appropriate remedies for its cure. Many may have occasion to consult a physician but few are able to determine his qualifications. Reliance in this respect must therefore be placed upon an assurance, usually in the form of a license granted by competent authority. Consideration for the protection of society has led many States to exclude from the practice of medicine those who upon an examination have been found not qualified therefor.

The General Assembly, in framing the Medical Practice act, was confronted by the necessity of applying its provisions to the schools of medicine or medical practice now existing and to those which might arise from time to time.

It was impossible to formulate a statute with particular reference to each. A plan of regulation was provided in a single, comprehensive enactment applicable alike to all schools, present and future. The plan divides licenses, (Cahill's Stat. 1923, sec. 11, pp. 2214, 2215,) so far as physicians are concerned, into two classes, one of which confers the right to practice medicine in all of its branches, and the other to treat human ailments without the use of drugs or medicines and without operative surgery, the licensee under such a license to be restricted by its terms to the practice of the system or method which he specifically designated in his application as the one he would undertake to practice.

The plaintiff in error contends that the act offends against the constitution because it is arbitrarily discriminatory in five particulars. The first is, that a graduate of a medical school who has passed the examination prescribed by section 8 may practice any system of drugless healing although he has never been examined concerning his qualifications to practice such system, while a person licensed to practice one of the systems which makes no use of drugs is not permitted to practice any other drugless method or the regular system without taking the course of study prescribed by section 5 and passing the examination required by section 8. The General Assembly was under the necessity of establishing some standard which would qualify a physician to practice generally without limitation, because specialists in every particular disease or form of treatment could not be found in every part of the State. In many rural districts the physician is compelled to treat every human ailment. This was a condition which confronted the legislature and had to be met by suitable provisions in a regulatory statute. It regarded the use of drugs and medicines and operative surgery as the most dangerous of the remedial agents likely to be employed by a physician, and for that reason it made those agents the dividing line between a practitioner authorized to treat any disease by whatever remedy he might

choose, and a practitioner authorized to practice any system or method of treating human ailments without the use of drugs or medicines and without operative surgery. The unrestricted practitioner is necessarily permitted to employ the same agencies for healing as are used by the restricted practitioner. The practitioner with an unrestricted license has a choice of methods of treatment, but there is no distinction between the two classes of practitioners as to the diseases which they may treat. The act makes no reference to any method of healing or to any school by name. The fact that one group of practitioners qualifying under a higher standard may use the same methods of treatment which the other group employs is not a discrimination. The difference between the respective rights of the two groups is based on a corresponding difference in attainments. The physician who has a license to practice medicine in all of its branches has complied with the requirements for such a license, while the naprapath, or any other drugless practitioner, by his own act has restricted himself to certain remedial agents the employment of which is not regarded by the legislature as sufficient to qualify him to treat every disease by every known remedial agent possibly applicable to it. The practitioner who possesses a restricted license voluntarily imposed upon himself the limitations under which he practices. If he wishes to practice medicine in all of its branches he is permitted by sections 12 and 12a (Cahill's Stat. 1923, p. 2215,) to qualify himself for an unrestricted license precisely as others do. The division of licenses into two classes is based upon substantial differences in the attainments of the licensees, and we cannot say that the classification is either unreasonable or discriminatory.

The second contention that the act is arbitrarily discriminatory is, that a drugless practitioner cannot be licensed to practice surgery without taking a course in materia medica, therapeutics and practice, even though the school teaching his system gives a course in surgery equal in all respects to

that given by the medical school. The practice of surgery requires the use of antiseptics, anæsthetics and other drugs and medicines. Hence the legislature required instruction in drugs and medicines as a necessary qualification to enable a physician to perform a surgical operation. In its judgment no person ought to be permitted to practice surgery without showing a knowledge of drugs and medicines. The act requires the examining authorities to give full credit to a course in surgery taught in a school of naprapathy. By section 12 of the act (Cahill's Stat. 1923, p. 2215,) a person licensed to practice any system or method of treating human ailments without the use of drugs or medicines and without operative surgery is permitted to obtain an unlimited license, and the additional courses of study required of such a person may be taken in a medical college or in "any professional school, college or institution teaching any system or method of treating human ailments." The naprapathic college under this section has equal rights with the medical college. The right accorded a naprapath, or any other person treating human ailments without the use of drugs or medicines and without operative surgery, to qualify himself to practice surgery and to acquire his instruction and training in surgery in his own kind of professional school is fully established by the act. The second contention of plaintiff in error cannot be sustained.

The third contention that the act is arbitrarily discriminatory is, that it provides by section 12 that any person licensed under the provisions of the act to practice without the use of drugs or medicines and without operative surgery may be permitted to take examinations in certain subjects to secure an unlimited license, but that this privilege is not extended to persons holding limited licenses under any prior statute. The act does not limit to persons who obtain restricted licenses under it the right of qualifying themselves for unlimited licenses by completing the necessary additional courses of study. Section 22 (Cahill's

Stat. 1923, p. 2219,) provides: "All licenses and certificates heretofore legally issued by authority of law in this State permitting the holder thereof to practice medicine, or to treat human ailments in any other manner, or to practice midwifery, and valid and in full force and effect on the taking effect of this act, shall have the same force and effect, and be subject to the same authority of the department to revoke or suspend them, as licenses issued under this act." Hence any person, under whatever act he may have secured a restricted license, may qualify himself, under the provisions of section 12, to practice medicine in all of its branches. The act is not discriminatory in the respect claimed.

The fourth contention of plaintiff in error that the act is arbitrarily discriminatory is, that under the provisions of section 5, sub-section 1*a*, a graduate from a medical college prior to the passage of the act, on proof of having completed a four years' course in a high school, may take the examination for a license to practice medicine in all of its branches, including surgery, while under sections 12 and 12*a* a graduate of a school teaching a drugless system, who graduated prior to the passage of the act, may not take an examination for a license which will permit him to practice surgery, unless, in addition to taking a course in medicine and surgery which will make his course of study equal to that of the medical schools, he can show that he has completed a two years' college course or that he has been engaged in the active practice of his profession for five years. By subsection 1*b* of section 5 of the act an applicant for a license to practice medicine in all of its branches, who is a graduate of a medical college after the passage of the act, must show that such medical college, at the time of his graduation, required as a prerequisite to admission thereto a two years' course of instruction in a college of liberal arts or its equivalent. An applicant for a license to practice any system or method of treating human ailments without the

315—19

use of drugs or medicines and without operative surgery who is a graduate of a school in which the particular system or method of treatment is taught, whether before or after the passage of the act, is not required to show any instruction whatever in any college of liberal arts. If a person chooses to fit himself for a particular system or method of treating human ailments and to limit his practice thereto the choice is voluntarily made. The educational requirements for such practice are not equal to those prescribed for the unrestricted practice of medicine. A practitioner who has a restricted license under the present or any prior act is permitted to qualify himself for the practice of medicine in all of its branches. Such additional preparation, made or completed after the passage of the act, necessarily is governed by its provisions. The graduate of a medical college after the passage of the act is required to show, in addition to his graduation from the medical college, a two years' course of instruction in a college of liberal arts. The limited practitioner who seeks an unrestricted license should also show the same preliminary education. The ultimate requirements are the same in both cases. The route of one is direct by graduation from a medical college; of the other it is indirect,—first by fitting himself for the treatment of human ailments by restricted methods, and later by completing courses of instruction equivalent to those taken by the graduate of a medical college. There is no arbitrary discrimination in the particular charged.

The last contention of the plaintiff in error that the act is arbitrarily discriminatory is, that section 37 provides that the act shall not apply to dentists, pharmacists, optometrists or other persons lawfully carrying on their particular profession or business under any law of the State regulatory thereof, nor to persons treating human ailments by prayer or spiritual means as an exercise or enjoyment of religious freedom. When the Medical Practice act became effective there were in force in this State statutes reg-

ulating dentists, pharmacists and optometrists. These statutes regulatory of these several professions or occupations were left unamended. The law-making bodies of various States have found sufficient differences between physicians, dentists, pharmacists and optometrists to regulate them by different acts. The exemption is not without limitation, but only to the extent that the persons mentioned lawfully pursue "their particular profession or business under any valid existing act of this State regulatory thereof." All persons are subject to the Medical Practice act, including dentists, pharmacists and optometrists, but they are permitted to practice their professions under the particular statutes applicable to them, and are exempt from the provisions of the Medical Practice act only to the extent that they are included within the dental, pharmacy and optometry acts, respectively. The exemption of persons treating human ailments by prayer or spiritual means is limited to those who do so as an exercise or enjoyment of religious freedom. It finds justification in the third section of the bill of rights. The exemptions created by section 37 are not unreasonable.

Plaintiff in error finally contends that the act is unconstitutional because it attempts to delegate legislative power to the Department of Registration and Education in the following particulars: (*a*) By section 6 the course of instruction in high schools or other schools, and colleges of liberal arts, required by any medical college or professional school, college or institution, shall be such as shall be satisfactory to the department; and (*b*) by the third subsection of section 19 the department shall have power to determine the standard of literary or scientific colleges, high schools, seminaries, normal schools, preparatory schools, graded schools, and the like, in the discharge of its duties. These sections of the act are not the only applicable provisions. Section 7 requires that all examinations provided for by the act shall be conducted under rules and regulations prescribed from time to time by the department. The ninth

section provides that the examinations of applicants who seek to practice any system or method of treating human ailments without the use of drugs or medicines and without operative surgery shall be the same as required of applicants who seek to practice medicine in all of its branches, excepting therefrom materia medica, therapeutics, surgery, obstetrics, and theory and practice. The first sub-section of section 19 requires the department to make rules for establishing reasonable minimum standards of educational requirements to be observed by medical colleges, or by any professional school, college or institution teaching any system or method of treating human ailments, and to determine the reputability and good standing of all schools, colleges and institutions. By the twentieth section it is provided that the provisions of the act shall not be so construed as to discriminate against any system or method of treating human ailments, or against any medical college or any professional school, college or institution teaching any system or method of treating human ailments, on account of any such system or method which may be taught or emphasized in such medical college or in any such professional school, college or institution. Hence the act requires the making of rules and regulations under which all examinations shall be conducted; it enjoins uniformity in examinations, so far as their nature will permit; it imposes the duty of making rules for establishing reasonable minimum standards of educational requirements, and it expressly prohibits discrimination against any system or method of treating human ailments or against any medical school or college whatever. The department is not permitted, under the act, arbitrarily to prescribe minimum standards of educational requirements nor conduct examinations of applicants for licenses according to its arbitrary whim or caprice. The rules and regulations promulgated by the department are subject to review by the courts to determine whether or not they are reasonable. (*Kettles* v. *People,*

221 Ill. 221.) It cannot be presumed that the powers conferred upon the department will be exercised arbitrarily. Until the contrary is shown, courts indulge the presumption that public officers perform their duties without discrimination and without exercising their powers arbitrarily. (*Douglas* v. *Noble,* 261 U. S. 165.) The act itself (section 5) fixes minimum standards of professional education to be enforced by the department in conducting examinations and issuing licenses. Moreover, the limitations of the act within which the department must perform its duties exempt the act from the charge that it delegates legislative power in the particulars specified.

The judgment of the municipal court of Chicago will be affirmed.

*Judgment affirmed.*

DUNCAN, C. J., and FARMER, J., dissenting.

---

(No. 16350.—Reversed and remanded.)
W. R. HUNTER, Appellant, *vs.* H. H. TROUP *et al.*
Appellees.

*Opinion filed December 16, 1924—Rehearing denied Feb. 10, 1925.*